IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DAVETTE ESPARZA, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 3:12-cv-00662-D |
| | § | |
| BANK OF AMERICA, N.A. and | § | |
| RODERICK WILSON, | § | |
| | § | |
| Defendants. | § | |

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

By:   s/ Brian Patterson
       Brian Patterson
       Texas Bar No. 24042974
       McGuireWoods LLP
       600 Travis, Suite 7500
       Houston, Texas 77002
       (713) 571-9191
       (713) 571-9652 (fax)
       bpatterson@mcguirewoods.com

**ATTORNEY IN CHARGE FOR**
**DEFENDANTS**

## **TABLE OF CONTENTS**

I.      SUMMARY ................................................................................................ 1

II.     STATEMENT OF FACTS ........................................................................ 2

     A.      Esparza's Employment with the Bank. ......................................... 2

     B.      The Audit of Esparza's Banking Center. ...................................... 2

     C.      Esparza's First Written Warning. .................................................. 3

     D.      The Leadership Call Discussing the Audit. ................................... 4

     E.      Esparza's Request for Intermittent FMLA Leave............................ 4

     F.      Esparza's Continued Poor Performance and Final Written Warning. ........... 5

     G.      Esparza's Need to Sit. .................................................................. 6

     H.      Esparza's Performance Reviews. .................................................. 7

     I.      Esparza's Breach of Information Security. .................................... 7

     J.      Esparza Approves a Teller Transaction that Violated Bank Policy and Resulted in a $2,240 Loss. .......................................... 9

     K.      The September Mock Audit. .......................................................... 10

     L.      Esparza's Employment is Terminated. ......................................... 10

III.    ARGUMENTS AND AUTHORITIES........................................................ 11

     A.      Standard for Summary Judgment................................................. 12

     B.      Defendants Did Not Interfere with Plaintiff's FMLA Rights. ...................... 13

     C.      Plaintiff Cannot State a Claim Under the ADA For Failure to Accommodate. ............................................................................. 14

     D.      Plaintiff Cannot Sustain a Claim for Discrimination or Retaliation Under the FMLA, ADA or TCHRA. .......................... 15

i

1.      Plaintiff Cannot Establish a *Prima Facie* Case of
        Discrimination or Retaliation Under the FMLA and ADA. .............   16

2.      The Bank Terminated Plaintiff's Employment for Legitimate
        Non-Discriminatory and Non-Retaliatory Reasons and
        Plaintiff Has No Evidence that the Reasons for Her
        Termination Were a Mere Pretext for Discriminatory
        or Retaliatory Motive or Animus........................................................   18

E.      Plaintiff's Claims Against Wilson Should Be Dismissed Because
        He is not an "Employer" as Defined by the FMLA.......................   20

IV.   CONCLUSION............................................................................................   21

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................ 12

*Appleberry v. Fort Worth Indep. Sch. Dist.*,
C.A. No. 4:12-CV-235-A, 2012 U.S. Dist. LEXIS 150316
(N.D. Tex. Oct. 17, 2012) ...................................................................................... 20

*Bell v. Dallas County*,
432 Fed. App'x. 330 (5th Cir. 2011) ...................................................................... 13

*Bell v. Dallas County*,
C.A. No. 3:08-CV-1834-K, 2011 U.S. Dist. LEXIS 98784
(N.D. Tex. Aug. 30, 2011)...................................................................................... 13

*Bleak v. Providence Health Ctr.*,
454 Fed. App'x. 366 (5th Cir. 2011) ...................................................................... 17

*Bocalbos v. Nat'l W. Life Ins. Co.*,
162 F.3d 379, 383 (5th Cir. 1998) ..................................................................... 13, 16

*Brooks v. Lubbock Cnty. Hosp. Dist.*,
373 Fed. App'x. 434 (5th Cir. 2010) ...................................................................... 18

*Burris v. Brazell*,
2008  WL5220578 (N.D. Tex. Dec. 15, 2008) ....................................................... 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................ 12

*Cervantez v. KMPG Servcs. Co.*,
2009  WL2957297 (5th Cir. Sept.  16, 2009)........................................................... 19

*Deines v. Tex. Dept. of Protective & Regulatory Servs.*,
164 F.3d 277 (5th Cir. 1999) .................................................................................. 18

*Harville v. Tex. A&M Univ.*,
833 F. Supp. 2d 645 (S.D. Tex. 2011)............................................................... 20, 21

*Hornsby v. Conoco, Inc.*,
777 F.2d 243 (5th Cir. 1985)................................................................................... 12

*Hunt v. Rapides Healthcare Sys., LLC*,
277 F.3d 757 (5th Cir. 2001) .............................................................................. 15, 16

*Jenkins v. Guardian Indus. Corp.*,
    16 S.W.3d 431 (Tex. App.-Waco 2000, pet. denied).................................................. 20

*Leal v. B F T, L.P.*,
    713 F. Supp. 2d 669 (S.D. Tex. 2011) ................................................................... 15

*LeMarie v. Louisiana Dept. of Transp.*,
    480 F.3d 383 (5th Cir. 2007) ................................................................................. 19

*Lopez v. Tyler Refrigeration Corp.*,
    1999 U.S. Dist. LEXIS 6270 (N. D. Tex. 1999)..................................................... 16

*Lottinger v. Shell Oil Co.*,
    143 F. Supp. 2d 743 (S. D. Tex. 2001) .................................................................. 16

*Martin v. The Kroger Co.*,
    65 F. Supp. 2d 516 (S.D. Tex. 1999) ..................................................................... 20

*Mayberry v. Fought Aircraft Co.*,
    55 F.3d 1086 (5th Cir. 1995) ................................................................................. 18

*McCoy v. City of Shreveport*,
    492 F.3d 551 (5th Cir. 2007) ................................................................................. 15

*McInnis v. Alamo Cmty. Coll. Dist.*,
    207 F.3d 276 (5th Cir. 2000) ................................................................................. 17

*McVille v. Inter-Community Healthcare, Inc.*,
    460 Fed. App'x, 353 (5th Cir. 2012) ..................................................................... 18

*Oby v. Baton Rouge Marriott*,
    329 F. Supp. 2d 772 (M.D. La. 2004)..................................................................... 20

*Pineda v. United Parcel Servcs., Inc.*,
    360 F.3d 483 (5th Cir. 2004) ................................................................................. 19

*Richardson v. Monitronics Int'l, Inc.*,
    434 F.3d 327 (5th Cir. 2005) ................................................................................. 15

*Rios v. Rossotti*,
    252 F.3d 375 (5th Cir. 2001)................................................................................. 16

*Seaman v. CSPH, Inc.*,
    179 F.3d 297 (5th Cir. 1999) ................................................................................. 17

*Shabazz v. Tex. Youth Comm'n*,
    300 F. Supp. 2d 467 (N. D. Tex. 2003) ................................................................. 20

*Tabatchnik v. Continental Airlines,*
        262 F. App'x 674 (5th Cir. 2008) ............................................................... 15

*Texas Dept. of Cmty. Affairs v. Burdine,*
        450 U.S. 248 (1981) ................................................................................. 16

*Topalian v. Ehrman,*
        954 F.2d 1125 (5th Cir.1992), *cert. denied*, 506 U.S. 825 (1992)............................ 12

*Trevino v. United Parcel Servs.,*
        C.A. No. 3:08-CV-0889-B, 2009 U.S. Dist. LEXIS 92416
        (N.D. Tex. Oct. 5, 2009) ......................................................................... 20, 21

*Wal-Mart v. Canchola,*
        121  S.W.3d 735 (Tex. 2003)....................................................................... 19

## Statutes

FED. R. CIV. P. 56(c) ................................................................................. 12

FED.R.CIV. P. 56(e) .................................................................................. 12

29 U.S.C. § 2615(a)(1).............................................................................. 13

42 U.S.C. § 12112(b)(5)(A) ......................................................................... 14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| DAVETTE ESPARZA, | § |
| | § |
| Plaintiff, | § |
| v. | § CIVIL ACTION NO. 3:12-cv-00662-D |
| | § |
| BANK OF AMERICA, N.A. and | § |
| RODERICK WILSON, | § |
| | § |
| Defendants. | § |

**BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Bank of America, N.A. ("Bank of America" or "the Bank") and Roderick

Wilson ("Wilson") (collectively "Defendants") move for summary judgment on the claims

asserted by Plaintiff Davette Esparza ("Esparza" or "Plaintiff").

## I.    SUMMARY

On September 16, 2011, Bank of America terminated Esparza's employment because of

her poor performance.  The termination of her employment was the culmination of Plaintiff's

unacceptable performance as a banking center manager, including multiple written warnings, her

conduct surrounding her approval of a transaction that resulted in a $2,240 loss to the Bank, and

a security investigation which revealed that she had improperly opened a customer account in

violation of the Bank's policies and procedures.   Notwithstanding these undisputed and

significant performance failures, Plaintiff now sues for discrimination, failure to accommodate,

and retaliation under the Americans with Disabilities Act ("ADA") and the Texas Commission

on Human Rights Act ("TCHRA"), and for interference and retaliation under the Family and

Medical Leave Act ("FMLA").  Plaintiff's claims are without merit and should be dismissed as a matter of law.

## II.   STATEMENT OF FACTS

### A.   Esparza's Employment with the Bank

Esparza began working for Bank of America as a personal banker in January 2003. (Appx. 2).  She was promoted to assistant banking center manager in April 2008.  (Appx. 3).  On November 16, 2010, she was promoted to banking center manager of the Wheatland Banking Center.  (Appx. 4).  In this position, Esparza reported to consumer market manager, Roderick Wilson, and her consumer market executive was Melissa Gonzalez.  (Appx. 50 ¶ 4; 31 ¶ 4).

Banking center managers are the most senior associates in a banking center and are responsible for all aspects of the center's operations.  (Appx. 10-11).  They are given broad discretion to ensure that the banking center for which they are responsible performs successfully. They establish the schedules for the banking center employees, assign who performs daily tasks, issue discipline when necessary, and have the ability to focus their efforts on any area of the banking center they feel necessary.  (Appx. 31-32 ¶ 5).

### B.   The Audit of Esparza's Banking Center

Banking centers are subject to periodic audits referred to as Banking Center Control Review ("BCCR"), during which a team of auditors reviews the banking center's compliance with the Bank's policies and procedures in order to help ensure that the banking centers are prepared for the BCCR audits, regional management often conduct mock audits of the banking centers.  (Appx. 32 ¶ 6).

In May 2011, Doris Williams, an assistant manager of another banking center, conducted a mock audit of Esparza's banking center.  This mock audit identified a number of violations,

known as "findings." These violations included failing to perform surprise cash counts, conducting improper wire transfers, and not properly documenting three transactions in the amounts of $9,400.00, $16,000.00, and $14,650.00. (Appx. 65-66; 53 ¶ 17).

Approximately two weeks later, on June 9, 2011, a BCCR audit of Esparza's banking center was conducted by Deana Haley. The audit identified fifteen findings, three of which were issues that had been identified in previous BCCR audits of the banking center, known as "repeat findings." (Appx. 32 ¶ 7-8; 35-37). The results were particularly concerning because they were in areas intended to mitigate the risk of losses to the Bank, including "Anti-Money Laundering Compliance, Teller Function/Cash Counts, Consignment Items, Proof Work, and New Account Controls." *(Id.)*. On June 10, 2011, Michael Rogers, the area executive, sent an e-mail message to Esparza, Wilson, and Gonzalez, concerning the audit. Rogers stated that "[t]he results are disappointing – big decline from previous audit. I am very concerned . . . This requires a team effort to immediately correct . . . These are huge risk concerns – this must be addressed." *(Id.)*.

## C.      Esparza's First Written Warning

Three days later, on June 13, 2011, Wilson and Gonzalez met with Esparza and her assistant banking center manager, Thomas Mungia, to discuss the results of the audit and issue to them formal written warnings. (Appx. 32 ¶ 9). Esparza's written warning addressed the audit results as well as her overall failure to meet performance expectations. Among the issues addressed in the written warning was that Esparza's banking center was missing twenty debit cards, was not properly destroying checks, was not performing surprise cash counts, and that Esparza was not properly reviewing new account documents. (Appx. 32 ¶ 9; 38-39). Esparza also was informed in the written warning that she was "expected to demonstrate immediate and sustained improvement in the areas specifically addressed above," and that the failure to meet

these expectations could result in "further disciplinary action up to and including termination." (Appx. 38-39).

### D.    The Leadership Call Discussing the Audit

In order to allow other banking centers in the region to improve their audit performance and compliance with Bank policies and procedures generally, Gonzalez's practice is to discuss BCCR results on her periodic leadership calls with all of the banking center managers in the region.  (Appx. 32 ¶ 10).  On June 14, 2011, Esparza was informed that the audit of her banking center would be discussed on the leadership call the following morning, and Esparza was provided a copy of the PowerPoint presentation that would be used during the call.  (Appx. 32 ¶ 12).  Esparza did not voice any objection to the discussion of the audit or to the accompanying PowerPoint presentation prior to the leadership call.  (*Id.*).  Eight days later, Esparza called the Bank's Advice and Counsel department and complained that she felt that Gonzalez was very harsh during the call and that she believed that other banking centers with similar audit scores did not receive the same treatment.  (Appx. 27-28).  In response, Advice and Counsel investigated Esparza's complaint by speaking with Gonzalez; after which Advice and Counsel concluded that there was nothing inappropriate about Gonzalez's conduct.  (Appx. 25-26; 29-30).

### E.    Esparza's Request for Intermittent FMLA Leave

On June 15, 2011, Esparza left work and saw her doctor because of pain in her back. (Appx. 86, 99).  The following day, pursuant to the Bank's FMLA policy, Esparza requested FMLA leave by contacting Aetna, the Bank's leave administrator.  (Appx. 77; 86; 49; 33 ¶ 15). In support of her request for leave, Esparza submitted documentation from her doctors stating that she suffered from "chronic arthritis pain" and would need to miss work periodically "during

her flare ups of pain." (Appx. 99).  On June 23, 2011, Aetna approved Esparza's request for intermittent FMLA leave, and designated her absences on June 15 and 16, 2011 as FMLA leave. (Appx. 79).

Esparza subsequently requested FMLA leave for the afternoon of July 7, 2011, July 8, 2011, July 19, 2011, August 9, 2011, and September 19-23, 2011, all of which were approved by Aetna. (Appx. 87-95). Esparza admits that neither the Bank nor Aetna ever denied any request she made for FMLA leave. (Appx. 13).

F.      **Esparza's Continued Poor Performance and Final Written Warning**

Despite receiving the June 13, 2011, written warning, Esparza's performance continued to decline.  On July 7, 2011, Wilson visited the banking center and discovered that Esparza had conducted less than one-third of the number of seller observations she was required to complete. (Appx. 50-51 ¶ 5). Wilson had previously issued Esparza a verbal warning for failing to complete the requisite number of seller observations.  (*Id.*).  During his July 7, 2011, visit, Wilson requested that Esparza develop and provide to him by July 11, 2011, an Action Plan to address her declining professional treatment scores.  (Appx. 51 ¶ 6).  Esparza missed the deadline to submit her Action Plan – not delivering it until July 14.  (*Id.*).

On July 8, 2011, Esparza's assistant banking center manager, Mungia telephoned Wilson and complained that Esparza was failing to attend weekly leadership meetings, was interviewing for jobs outside the Bank during work hours, and, was leaving the banking center without a supervisor being present, which created a significant, adverse impact on the Bank's customers. (Appx. 51 ¶ 7).  Mungia also told Wilson that several associates had complained to him about Esparza.  (*Id.*).  As a result, Wilson interviewed ten of the banking center's associates, four of whom confirmed that Esparza had left the banking center without a supervisor being present on

several occasions, and that they had to turn customers away as a result. (Appx. 51 ¶ 8; 56-58). The associates also shared other concerns about Esparza's leadership, including that Esparza screamed at associates in front of other associates, was unable to answer questions about their job or how to perform certain duties, and had harassed associates who called in sick. (*Id.*). Two of the associates Wilson interviewed told him that they had complained to the Bank's Advice and Counsel department about Esparza. (*Id.*).

As a result of Esparza's continued poor performance, failure to meet deadlines, and the numerous concerns raised by her staff, Wilson and Gonzalez met with Esparza on July 18, 2011, and issued to her a final written warning for "Failure to Meet Performance Expectations." (Appx. 52 ¶ 9; 33 ¶ 13; 40-41). Like the previous written warning, the final written warning specifically identified Esparza's recent performance deficiencies. These included Esparza's failure to meet five different deadlines, failure to perform the appropriate number of seller observations, and her decision to leave the banking center unattended which caused the associates to have to turn customers away. (Appx. 40-41). The final written warning once again put Esparza on notice that her continued failure to meet expectations could result in the termination of her employment. (*Id.*).

## G.  Esparza's Need to Sit

On July 21, 2011, three days after receiving her final written warning, Esparza submitted a note from her doctor indicating that she needed to sit down every thirty minutes for three to four minutes at a time. (Appx. 96). As the banking center manager, Esparza was the most senior person at her banking center and had complete discretion over when she sat or stood. Esparza admits that she was able to "sit down as needed." (Appx. 12). Esparza also had the authority to

direct who performed which job duties at her banking center and to specify when they should be performed. (Appx. 7-8; 31-32 ¶ 5).

## H.    Esparza's Performance Reviews

Esparza's deficient and declining performance as the banking center manager was reflected in her quarterly performance reviews.   In her March 1, 2011 performance review, Esparza received a "Does Not Meet" expectations rating in *one* of the six categories of performance - "Drives Execution." (Appx. 54 ¶ 18; 67-68).  On June 1, 2011, Esparza received a "Does Not Meet" expectations rating in *three* of the six categories – "Drives Execution," "Risk Management," and "Leads People to Perform." (Appx. 67-68).  Finally, on September 1, 2011, Esparza received a "Does Not Meet" expectations rating in *five* of the six categories – "Drives Execution," "Risk Management," "Grows the Business," "Leads People to Perform" and "Overall Behavior" – and failed to meet expectations in her "Annual Behavior Rating." (*Id.*).

## I.    Esparza's Breach of Information Security

On July 26, 2011, Melody Valdez, a personal banker at Esparza's banking center, reported a security violation to the Bank's ethics hotline. (Appx. 70 ¶ 5).  Specifically, Valdez reported that Esparza had opened an account using Valdez's NBK (username and password), which is a violation of bank policy. (Appx. 70 ¶ 5-6). Valdez reported that this occurred on July 20, 2011, when she encountered a problem opening a new account while assisting a customer in her office that prompted the customer to request to speak to the manager. (Appx. 70 ¶ 6). When Valdez asked Esparza to come to her office to assist with the issue, Esparza told her to leave the office and assist in the bank lobby. (*Id.*).  When Valdez attempted to sign off her computer before leaving the office, Esparza directed her to remain signed on to the computer. (*Id.*).  Esparza remained in the office with the customer for thirty to forty minutes thereafter.

(*Id.*). Later that day, Valdez discovered that Esparza had opened an account under Valdez's NBK when she saw a signature card related to the new account which showed it had been opened under her NBK. (Appx. 70 ¶ 7).

Each associate at the Bank is assigned a unique identification "NBK" code, similar to a username and password, which allows the associate to log into the Bank's computers. The Bank is able track all banking activity conducted under an associate's NBK. (Appx. 69 ¶ 3). Conducting any transaction under another associate's NBK is a violation of the Bank's security protocols and a cause for termination. (*Id.*).

Cheri Lollman, a senior fraud investigator for the Bank's Corporate Security department, investigated Valdez's complaint to the ethics hotline. (Appx. 69 ¶ 2; 70 ¶ 5). Lollman reviewed the data entry audit trail for Valdez's NBK and security video footage from the banking center, and interviewed Valdez, Mungia, and the customer for whom the account had been opened. (Appx. 70-72 ¶ 6-13). Mungia reported that Valdez told him that Esparza opened an account under Valdez's NBK. (Appx. 72 ¶ 12). The data entry audit trail confirmed that an account had been opened under Valdez's NBK, which, at the time the account was opened, was being used simultaneously by two different individuals. (Appx. 71 ¶ 9). The video confirmed Esparza was alone with the customer in the office containing the computer used to open the account when the account was opened. (Appx. 71 ¶ 10). The customer identified Esparza as the person who opened the account. Lollman concluded her investigation by interviewing Esparza who denied opening the account. (Appx. 71-72 ¶ 11).

As a result of her investigation, Lollman concluded that Esparza had opened the account under Valdez's NBK in violation of the Bank's policies and procedures. Lollman reported her

findings to Advice and Counsel on September 15, 2011. (Appx. 72 ¶ 14).   The Advice and
Counsel representative recommended that Esparza's employment be terminated as a result. (*Id.*)

Prior to conducting the investigation, Lollman had never met Esparza, and when she
conducted the investigation, she had no knowledge of whether Esparza had requested or taken
FMLA leave, or whether she suffered from a disability. (Appx. 73 ¶ 15).   In every instance in
which Lollman has been involved with an investigation that concluded that an associate had
worked under another associate's NBK, the associate's employment has been terminated.
(Appx. 69-70 ¶ 4).

**J.      Esparza Approves a Teller Transaction that Violated Bank Policy and Resulted in a
          $2,240 Loss**

In August 2011, Esparza's banking center experienced a $2,240 loss from a transaction in
which an individual impersonated a customer by using an improper form of identification, which
was accepted in violation of the Bank's policies and procedures. (Appx. 52-53 ¶ 10-13).   Wilson
discussed the transaction at length with Esparza who blamed it on the teller who conducted it.
(*Id.*).   Wilson encouraged Esparza to call the Bank's Advice and Counsel department to discuss
the situation, and told her that he felt disciplinary action against the teller was warranted. (*Id.*).

The following week, on August 24, 2011, Mungia called Wilson concerning the $2,240
loss.   He told Wilson that Esparza had instructed him to issue a final written warning to the teller
who had conducted the transaction, but that he was uncomfortable disciplining the teller because
Esparza had approved the transaction. (*Id.*).   Alarmed that Esparza had not mentioned that she
had been involved in the improper transaction, Wilson requested a copy of the transaction and
found Esparza's NBK on it confirming that Esparza had approved it. (*Id.*).   His discovery that
Esparza had approved the improper transaction gave Wilson serious concern about Esparza's
judgment.   Not only had she accepted an improper form of identification that resulted in a $2,240

loss, she had failed to disclose that she had been involved in the transaction, and she instructed Mungia to issue a final written warning to another associate for own her mistake. (*Id.*). Esparza now concedes that she approved the transaction. (Appx. 14).

Wilson called Advice and Counsel to report the situation and seek advice regarding how he should respond. Ultimately, he decided that he would wait for the results of the pending security investigation being performed by Ms. Lollman before making a final decision on the appropriate disciplinary action. (Appx. 42-53 ¶ 13).

K.      **The September Mock Audit**

On Friday, September 2, 2011, the Bank conducted another mock audit of Esparza's banking center. The audit revealed that the banking center was violating polices and procedures for shipments of cashier checks, was not performing the requisite number of cash counts, was improperly performing the cash counts that were conducted, was improperly conducting wire transfers, and was not adhering to the policies and procedures relating to cash box lists. (Appx. 53 ¶ 14; 59-64). Had it been a real audit Esparza's banking center would have received 14 findings and a failing score. (*Id.*). These audit results, on the heels of Wilson's discovery concerning the $2,240 loss approved by Esparza, led him to conclude that Esparza lacked the judgment necessary to be a banking center manager. (Appx. 53 ¶ 14). However, because the security investigation was still pending, he chose not to act until after it was concluded and he had spoken to the senior fraud investigator, Lollman. (*Id.*).

L.      **Esparza's Employment is Terminated**

On September 16, 2011, Wilson spoke with Lollman about the results of her investigation. (Appx. 53 ¶ 15). Lollman told him that she had determined that Esparza had opened a customer account using another employee's NBK, and that she and Advice and

10

Counsel agreed that termination of Esparza's employment was appropriate. (*Id.*).  Based on this information, the $2,240 loss approved by Esparza, and the continued poor performance of Esparza's banking center as evidenced by the most recent mock audit, Wilson decided to terminate Esparza's employment.  (Appx. 16-17).  Wilson met with Esparza in her office that day and informed her that her employment was being terminated for overall poor performance. (Appx. 53 ¶ 16).

## III.   ARGUMENTS AND AUTHORITIES

Despite the multiple legitimate reasons justifying the termination of Esparza's employment, and her admissions that Defendants never denied her FMLA leave or any accommodation based on her alleged disability, Plaintiff filed a Complaint against Bank of America and Roderick Wilson alleging that they interfered with her rights under the FMLA, refused to accommodate her disability, and discharged her in violation of the FMLA, ADA, and TCHRA. (Appx. 6-8; 13).  The undisputed evidence demonstrates that these claims have no merit and the Court, therefore, should grant summary judgment in favor of Defendants and dismiss Plaintiff's Complaint in its entirety because: (1) Defendants did not interfere with her rights under the FMLA and in fact Esparza took FMLA leave repeatedly and without issue; (2) Esparza was not denied any accommodation for her alleged disability; (3) Defendants did not discriminate or retaliate against her under the FMLA, ADA, or TCHRA; and (4) there is no basis for maintaining any claim against Wilson under the FMLA because he was not her "employer". Bank of America terminated Esparza's employment because of her declining and unacceptable performance as a banking center manager, her conduct related to the $2,240 loss, and the result of the security investigation during which the investigator concluded that Esparza violated Bank policy by opening an account using another associates' NBK.  Plaintiff has no evidence that

these legitimate, non-discriminatory reasons for terminating her employment were mere pretext for discrimination or retaliation.

## A.  Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.  Factual disputes that are irrelevant or unnecessary will not defeat summary judgment. *Id.*  Summary judgment is proper against a party who fails to establish the existence of an element essential to his or her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In order to defeat summary judgment, the opposing party "must set forth specific facts showing there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Anderson*, 477 U.S. at 248.  The non-movant may not rest on unsubstantiated allegations but must produce competent, tangible evidence to survive summary judgment. *Celotex*, 477 U.S. at 324.  The non-movant's burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Id.*  Personal beliefs, no matter how genuinely held, are not evidence on which a verdict may rest because personal beliefs do not raise a genuine issue of material fact. *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 246 (5th Cir. 1985).  Furthermore, "[m]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied*, 506 U.S. 825 (1992).

**B.      Defendants Did Not Interfere with Plaintiff's FMLA Rights**

Under the FMLA it is "unlawful for any employer to interfere with, restrain, or deny the

exercise of or the attempt to exercise, any right provided" by the FMLA.[1]   29 U.S.C.

§ 2615(a)(1); *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998); *Bell v.

Dallas County*, 432 Fed. App'x. 330, 334 (5th Cir. 2011). "To present an interference claim, the

plaintiff must show that: (1) he is an eligible employee under the FMLA; (2) the defendant is an

employer subject to the requirements of the FMLA; (3) the employee was entitled to FMLA

leave; (4) the employee gave notice to the defendant of his intention to take FMLA leave; and

(5) the defendant denied him benefits to which he was entitled under the FMLA." *Bell v. Dallas

County*, C.A. No. 3:08-CV-1834-K, 2011 U.S. Dist. LEXIS 98784 (N.D. Tex. Aug. 30, 2011).

In this case, Plaintiff cannot sustain such a claim because Plaintiff admits that she was

never denied any FMLA leave that she requested.  During her deposition she testified as follows:

Q: Did you ever apply for FMLA and have that application for leave denied?

A: No.

(Appx. 13).

Moreover, there is no evidence that Defendants' actions otherwise interfered with

Plaintiff taking FMLA leave.  To the contrary, the undisputed evidence establishes that from

June 2011 through the end of her employment, Plaintiff periodically requested and took FMLA

leave without issue. (*See supra* at II.E.).  Accordingly, Plaintiff's FMLA interference claim

should be dismissed.

---

[1] Furthermore, Plaintiff's FMLA claims against Wilson should be dismissed because he is not an employer under the FMLA. (*See infra at III.E.*)

13

**C.     Plaintiff Cannot State a Claim Under the ADA For Failure to Accommodate**

Under the ADA, a covered employer must provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . ., unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).

In this case, Plaintiff cannot sustain a claim that Defendants failed to accommodate her because the only accommodation she identified as having needed is the ability to sit for several minutes each hour in the work day, and Plaintiff's own testimony establishes that she was able to sit as needed throughout the work day. She testified that, as the banking center manager and the most senior official at the banking center, Plaintiff had complete control over whether she sat or stood during the work day. She could stand or sit as necessary and would direct others to perform tasks so that she could do so. Plaintiff's testimony makes this clear.

> Q. Okay. Were you unable to sit down or were you able to sit down? Were you prevented from sitting?
>
> A. I would sit down as needed.

(Appx. 12).

> Q. You would stand or sit?
>
> A. Whichever. If my foot was swelling or hurting, I would sit down. If my knee was hurting or my back was hurting because I was sitting down too much, I would stand up.

(Appx. 6).

> Q. So where there times when you had other problems, physical problems?
>
> A. Yes.
>
> Q. And would you assign other people to lobby lead when you had those physical problems?

A. They were all compounding injuries, so one affected the other, so it would be if I physically felt able that I could or could not, I would be there. And if I couldn't or I was asked or I was needed behind the teller line for any other reason, those are also situations where I would find somebody to lobby lead.

Q. But there were times when you felt physically unable to be able to lobby lead and you would assign somebody else to lobby lead as a result?

A. Or I would sit down.

Q. Or you would sit down. Was there anybody at the Wheatland Banking Center when you were the banking center manager there who was physically present who had the authority to tell you when you would could sit and when you could stand?

A. No.

(Appx. 7-8). Based on Plaintiff's own testimony, even assuming that Plaintiff's medical conditions rise to the level of a disability under the ADA, the undisputed evidence establishes that Defendants never denied Plaintiff any accommodation.

**D.     Plaintiff Cannot Sustain a Claim for Discrimination or Retaliation Under the FMLA, ADA or TCHRA**

Plaintiff's claims of discrimination and retaliation under the FMLA, ADA and TCHRA are all properly analyzed under the *McDonnell Douglas* burden shifting framework. *See Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001); *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005); *Tabatchnik v. Continental Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008). As such, Plaintiff bears the initial burden of establishing a *prima facie* case of retaliation or discrimination. If she does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory, non-retaliatory reason for Plaintiff's termination. *Hunt*, 277 F.3d at 768. The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *Leal v. B F T, L.P.*, 713 F. Supp. 2d 669, 673 (S.D. Tex. 2011) (*citing McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007)). At the summary judgment stage, Plaintiff must then demonstrate that a reasonable fact-finder could conclude that

Defendants' proffered reason for her termination is merely pretextual, and that their actions were retaliatory or discriminatory.   "Plaintiff may establish pretext directly, by showing that a discriminatory reason motivated the employer, or indirectly, by showing that the employer's reasons for the adverse employment action are not believable." *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The TCHRA is interpreted in a manner consistent with and analyzed using the same standards as federal law, and "if summary judgment is appropriate on a plaintiff's ADA claims, it is also appropriate on his TCHRA claims." *Lottinger v. Shell Oil Co.*, 143 F. Supp. 2d 743, 751-52 (S. D. Tex. 2001); *see also*, *Lopez v. Tyler Refrigeration Corp.*, 1999 U.S. Dist. LEXIS 6270, *5 n.1 (N. D. Tex. 1999).  Accordingly, the discussion herein of Plaintiff's claims under the ADA applies equally to her claims under the TCHRA.

1.      **Plaintiff Cannot Establish a** *Prima Facie* **Case of Discrimination or Retaliation Under the FMLA and ADA.**

The *prima facie* cases for discrimination and retaliation under the FMLA and ADA are substantially similar.

- To establish a *prima facie* case of discrimination or retaliation under the FMLA, Plaintiff must show that: (1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and (3) either that she was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because she took FMLA leave. *Bocalbos*, 162 F.3d at 383; *Hunt*, 277 F.3d at 768.

- To establish a *prima facie* case of discrimination under the ADA, Plaintiff must show that: (1) she suffers from a disability; (2) she was qualified for the job; (3) she was subject to an adverse employment action because of her disability; and (4) she was replaced by a

16

non-disabled person or was treated less favorably than non-disabled employees. *See McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276 (5th Cir. 2000). *Bleak v. Providence Health Ctr.*, 454 Fed. App'x. 366, 368 (5th Cir. 2011)

- To establish a *prima facie* case of retaliation under the ADA, Plaintiff must show that: (1) she engaged in activity protected by the ADA; (2) an adverse employment decision occurred; and (3) there was a causal connection between the protected activity and the adverse employment decision. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999).

Defendants acknowledge that Plaintiff's termination was an adverse employment action, and, for purposes of this motion, will assume that Plaintiff was protected by the FMLA, ADA and TCHRA. In addition, notwithstanding her failure to perform to the standard expected of a banking center manager, Defendants will assume for purposes of this motion that Plaintiff met the minimum qualifications for her job. However, Plaintiff cannot produce any evidence establishing the third and fourth elements of these claims. There is no evidence of discrimination – that is, that Plaintiff was treated less favorably than any similarly situated employee who was either not disabled or who had not requested or taken FMLA leave. Likewise, there is no evidence of retaliation because there are no facts that even suggest any causal connection between her alleged disability, or her requests for FMLA leave, and the termination of her employment. Accordingly, Plaintiff cannot establish a *prima facie* claim of discrimination or retaliation under the FMLA, ADA or TCHRA and summary judgment should be granted in favor of Defendants.

2.    **The Bank Terminated Plaintiff's Employment for Legitimate Non-
Discriminatory and Non-Retaliatory Reasons and Plaintiff Has No Evidence
that the Reasons for Her Termination Were a Mere Pretext for
Discriminatory or Retaliatory Motive or Animus.**

Assuming *arguendo* that Plaintiff could establish a *prima facie* under any theory, her claims still should be dismissed because she cannot overcome the legitimate, nondiscriminatory reasons for the termination of her employment.   In this case, Bank of America terminated Plaintiff's employment because of her declining and unacceptable performance as a banking center manager about which she had been repeatedly warned, her actions surrounding the $2,240 loss, and for violating the Bank's security procedures by opening a customer account using another associate's NBK.   (Appx. 16-17).   Each of these reasons was a legitimate, non-discriminatory, and non-retaliatory reason to terminate Plaintiff's employment, *see Brooks v. Lubbock Cnty. Hosp. Dist.*, 373 Fed. Appx. 434, 438 (5th Cir. 2010); *Mayberry v. Fought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995), and Plaintiff cannot satisfy her burden of establishing that the Bank's reasons for terminating her employment were pretextual.

Plaintiff's claim that the reasons Wilson gave for terminating her employment were "bogus and generalized" (*Amended Complaint ¶ 25*) is insufficient.   (Appx. 75).   More is required to survive summary judgment because the relevant issue "is whether an employer discriminated against its employee, not whether it made a correct disciplinary determination." *McVille v. Inter-Community Healthcare, Inc.*, 460 Fed. App'x. 353, 355 (5th Cir. 2012).   It is well-settled that "discrimination laws [are not] vehicles for judicial second-guessing of business decisions. . . .   Whether the employer's decision was the correct one, or the fair one, or the best one is not a question within the jury's province to decide.   The single issue for the trier of fact is whether the employer's [action] was motivated by discrimination." *Deines v. Tex. Dept. of*

18

*Protective & Regulatory Servs.*, 164 F.3d 277, 278 (5th Cir. 1999) (quotations and citations omitted).

To the extent Plaintiff attempts to dispute the conclusion of the security investigation regarding Plaintiff's mis-use of another associate's NBK to open an account, that too would be insufficient to defeat summary judgment. In order for a plaintiff to show that an employer's stated reason for termination was a pretext, the Fifth Circuit has stated that it is "not sufficient [for the plaintiff] to present evidence that the . . . investigation was imperfect, incomplete, or arrived at a possibly incorrect conclusion. [A plaintiff] must show that the reason proffered by [the defendant] is 'false, and discrimination was the real reason [for the termination]." *Pineda v. United Parcel Servcs., Inc.*, 360 F.3d 483, 489 (5th Cir. 2004) (citing *Wal-Mart v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003)); *LeMarie v. Louisiana Dept. of Transp.*, 480 F.3d 383, 391 (5th Cir. 2007)("Our anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones . . . [the plaintiff] must do more than simply argue that [the defendant] made an incorrect decision."). Even the "fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith." *Cervantez v. KMPG Servcs. Co.*, 2009 WL2957297*4 (5th Cir. Sept. 16, 2009)(emphasis added).

Here, there is no evidence that Lollman's security investigation of Plaintiff's mis-use of another associate's NBK to open an account was made in bad faith, and there is no reason to believe that it had anything to do with Plaintiff's alleged disability or requests for FMLA leave as Ms. Lollman had no knowledge of those matters. (Appx. 15).

Therefore, because Plaintiff has offered no evidence even suggesting that the termination of her employment was motivated by discrimination or retaliation instead of her deficient and

19

declining job performance, she cannot establish pretext, and her claims of discrimination and retaliation under the FMLA and ADA should be dismissed.

**E.     Plaintiff's Claims Against Wilson Should Be Dismissed Because He Is Not An "Employer" as Defined by the FMLA.**

Finally, Plaintiff's FMLA claims against Wilson should be dismissed for the additional reason that he was not Plaintiff's employer under the FMLA.[2]  Though the term employer is interpreted broadly, individual liability does not automatically accompany supervisory responsibility. *See Harville v. Tex. A&M Univ.*, 833 F. Supp. 2d 645, 654 (S.D. Tex. 2011); *Trevino v. United Parcel Servs.*, C.A. No. 3:08-CV-0889-B, 2009 U.S. Dist. LEXIS 92416, at *15 (N.D. Tex. Oct. 5, 2009).  This Court recognized this when concluding that "individual liability does not automatically accompany supervisor responsibility; even among those in 'supervisory positions' the 'FMLA does not contemplate holding individuals liable for corporate violations.'" *Burris v. Brazell*, 2008 WL5220578, *3 (N.D. Tex. Dec. 15, 2008).  For there to be individual liability here, Plaintiff must prove that Mr. Wilson exercised control over the Bank's compliance with the FMLA and/or Plaintiff's ability to take FMLA leave.  *See Harville*, 833 F. Supp. 2d at 654-55; *Trevino*, 2009 U.S. Dist. LEXIS 92416, at *15; *see also, Oby v. Baton Rouge Marriott*, 329 F. Supp. 2d 772, 788 (M.D. La. 2004) ("the test for liability is whether the defendant had the ability to control, in whole or in part, whether the plaintiff could take a leave of absence and return to the position").

---

[2] Plaintiff's Complaint cannot be read as asserting ADA or TCHRA claims against Wilson.  However, to the extent Plaintiff disagrees, such claims should be dismissed because it is well established that there is no individual liability under either the ADA or TCHRA.  *See Appleberry v. Fort Worth Indep. Sch. Dist.*, No. 4:12-CV-235-A, 2012 U.S. Dist. LEXIS 150316, *10-13 (N.D. Tex. Oct. 17, 2012) (ADA); *Shabazz v. Tex. Youth Comm'n*, 300 F. Supp. 2d 467, 473-74 (N.D. Tex. 2003) (ADA); *Martin v. The Kroger Co.*, 65 F. Supp. 2d 516, 533 (S.D. Tex. 1999) (TCHRA); *Jenkins v. Guardian Indus. Corp.*, 16 S.W.3d 431, 439 (Tex. App.-Waco 2000, pet. denied) (TCHRA).

Here, however, it is undisputed that Mr. Wilson did not have any control over the Bank's compliance with the FMLA and played no role in receiving, processing, or approving leave under the FMLA. (Appx. 18-23.)  All of Plaintiff's leave requests were made to and approved by Aetna, the Bank's leave administrator.   Furthermore, although Mr. Wilson did have supervisory authority over Plaintiff, he did not control Plaintiff's work schedule, did not set the conditions of her employment, did not determine her rate or method of payment, and did not maintain her employment records.  (Appx. 50 ¶ 3).  Plaintiff testified that Wilson would only show up at her banking center "maybe every two weeks, if not three weeks," and thus he had little to no involvement in the day-to-day operations of Plaintiff's banking center.  (Appx. 5). Accordingly, Mr. Wilson was not Plaintiff's employer under the FMLA, and he should be dismissed as a defendant in this action.  *See Trevino*, 2009 U.S. Dist. LEXIS 92416, at *17-18 (granting summary judgment in favor of individual defendant where defendant did not have "any significant role in receiving, processing, or approving leave under the FMLA"); *Harville*, 833 F. Supp. 2d at 655 (granting summary judgment where individual defendants did not have the "authority to exercise any independent control over whether the plaintiff could take leave").

## IV.   CONCLUSION

Based on the foregoing and the evidence in the Appendix that accompanies this memorandum, Defendants are entitled to summary judgment on all of Plaintiff's claims. Accordingly, Defendants respectfully request that the Court enter summary judgment for Defendants, dismiss Plaintiff's claims with prejudice, order her to pay Defendants' costs and fees, and award Defendants all other relief to which they are entitled.

Respectfully submitted

By:   s/ Brian Patterson
       Brian Patterson
       Texas Bar No. 24042974
       McGuireWoods LLP
       600 Travis, Suite 7500
       Houston, Texas 77002
       (713) 571-9191
       (713) 571-9652 (fax)
       bpatterson@mcguirewoods.com
**ATTORNEY IN CHARGE FOR
DEFENDANTS**

## CERTIFICATE OF SERVICE

I, Brian Patterson, an attorney, hereby certify that on this 14 day of December, 2012, a copy of the foregoing instrument was served on all counsel via the Court's ECF filing system.

          s/ Brian Patterson
        Brian Patterson

22