1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3    DAVETTE ESPARZA,                 :
                                       :
 4          Plaintiff,                 :
                                       :
 5    VS.                              : CIVIL ACTION NO.
                                       : 3:12-cv-00662-D
 6    BANK OF AMERICA, N.A. and        :
      RODERICK WILSON,                 :
 7                                     :
            Defendants.                :
 8

 9

10    ***************************************************

11                    ORAL DEPOSITION OF

12              DAVETTE ESPARZA RAMIREZ

13                  SEPTEMBER 26, 2012

14    ***************************************************

15

16

17

18

19          ORAL DEPOSITION OF DAVETTE ESPARZA
      RAMIREZ, produced as a witness at the instance of the
      Defendants, and duly sworn, was taken in the
20    above-styled and numbered cause on Wednesday, the 26th
      day of September, 2012, from 9:23 a.m. to 6:34 p.m.,
21    before Sarah Mae Blackburn, a Certified Court Reporter
      in and for the State of Texas, reported by machine
22    shorthand, at the Allen Law Firm, 4150 International
      Plaza, Suite 600, Fort Worth, Tarrant County, Texas
23    76109, pursuant to the Federal Rules of Civil
      Procedure and any stipulations stated on the record or
24    attached hereto.  It is further agreed that Rule
      30(b)(4) is waived by agreement of the parties.
25          Job No. CS1338847
```

EXHIBIT

**_A_**

tabbies

Page 21

1    January of 2003; is that correct?

2        A    Yes.

3        Q    I'm going to show you a chronology of your

4    employment.   I'm going to mark it as Exhibit 1.   And

5    it shows the positions that you held at Bank of

6    America and the times that you held them.

7        A    Okay.

8                (Ramirez Exhibit No. 1 marked.)

9        Q    (By Mr. Patterson)   Will you please review

10   this and let me know does it accurately reflect your

11   employment history?

12       A    Yes.   Except for I don't know why it says

13   "Asia" up there in the second column, I mean, the

14   second "personal banker II - Asia."

15       Q    Okay.   But other than that, it appears that

16   it reflects your employment history at Bank of America

17   accurately?

18       A    Yes.

19       Q    And so when you began working at Bank of

20   America in January of 2003, what position did you

21   hold?

22       A    I was hired in as a PBA, which is a personal

23   banker associate, which means you are in training

24   still.

25       Q    Okay.   And at what banking center did you

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3    DAVETTE ESPARZA,                 :

 4           Plaintiff,                :
                                       :
 5    VS.                              :  CIVIL ACTION NO.
                                       :  3:12-cv-00662-D
 6    BANK OF AMERICA, N.A. and        :
      RODERICK WILSON,                 :
 7                                     :
             Defendants.               :
 8

 9

10    *************************************************

11                    ORAL DEPOSITION OF

12               DAVETTE ESPARZA RAMIREZ

13                  SEPTEMBER 26, 2012

14    *************************************************

15

16

17

18

19                 ORAL DEPOSITION OF DAVETTE ESPARZA
      RAMIREZ, produced as a witness at the instance of the
20    Defendants, and duly sworn, was taken in the
      above-styled and numbered cause on Wednesday, the 26th
21    day of September, 2012, from 9:23 a.m. to 6:34 p.m.,
      before Sarah Mae Blackburn, a Certified Court Reporter
22    in and for the State of Texas, reported by machine
      shorthand, at the Allen Law Firm, 4150 International
23    Plaza, Suite 600, Fort Worth, Tarrant County, Texas
      76109, pursuant to the Federal Rules of Civil
24    Procedure and any stipulations stated on the record or
      attached hereto.  It is further agreed that Rule
25    30(b)(4) is waived by agreement of the parties.
         Job No. CS1338847
```

EXHIBIT

*A*

Page 21

1   January of 2003; is that correct?

2       A    Yes.

3       Q    I'm going to show you a chronology of your

4   employment.  I'm going to mark it as Exhibit 1.  And

5   it shows the positions that you held at Bank of

6   America and the times that you held them.

7       A    Okay.

8               (Ramirez Exhibit No. 1 marked.)

9       Q    (By Mr. Patterson)  Will you please review

10  this and let me know does it accurately reflect your

11  employment history?

12      A    Yes.  Except for I don't know why it says

13  "Asia" up there in the second column, I mean, the

14  second "personal banker II - Asia."

15      Q    Okay.  But other than that, it appears that

16  it reflects your employment history at Bank of America

17  accurately?

18      A    Yes.

19      Q    And so when you began working at Bank of

20  America in January of 2003, what position did you

21  hold?

22      A    I was hired in as a PBA, which is a personal

23  banker associate, which means you are in training

24  still.

25      Q    Okay.  And at what banking center did you

Page 24

1     Q    And when you refer to Rod, are you referring
2     to Roderick Wilson?
3          A    Yes.
4          Q    And he was one of the CMM's that oversaw the
5     Bedford Banking Center in 2008?
6          A    Yes.
7          Q    And what about Melissa Gonzalez?
8          A    I did not know or meet Melissa Gonzalez until
9     around March when Wheatland became part of the Dallas
10    reorganization.
11         Q    Okay.  And when you transferred from the
12    Grand Prairie Banking Center to the Bedford Banking
13    Center, what was your position at the Bedford Banking
14    Center in April of 2008?
15         A    Assistant manager.
16         Q    And how did you get the position of assistant
17    manager?
18         A    Mike Rogers had discussed it with me during
19    one of my performance assessments that he felt I was
20    ready for the next position.
21         Q    Okay.
22         A    And I expressed an interest in becoming an
23    assistant manager.
24         Q    And after you had that discussion, was there
25    a process that you went through?  Did you submit an

Page 70

1      A      From what I can recall they were a busier
2    banking center, meaning, there was a lot more
3    traffic.
4      Q      And you are referring to Cooper?
5      A      Yes.
6      Q      Okay.  Now in November 16th of 2010 you were
7    promoted to banking center manager; is that accurate?
8      A      Yes.
9      Q      And so prior to becoming a banking center
10   manager you had held the position of assistant manager
11   for approximately two-and-a-half years?
12     A      The three or four months prior to me
13   transferring to Wheatland, my manager, Jamie Tran, was
14   on maternity leave and I was the only assistant
15   manager at the time, they did away with the other
16   manager by that time, so I was the acting manager and
17   assistant manager for the three months prior to me
18   being asked to be BCM at the Wheatland location.
19     Q      Okay.  And so how did you apply for the
20   position at the Wheatland center?
21     A      I didn't.  I applied to be a BCM the same way
22   that I applied to be the AM or they said that we think
23   you are ready, you proved yourself those three months
24   while Jamie was out, maintained the same scores that
25   are maintained while Jamie is there, and I was asked

Page 85

1     Q     And when did Melissa Gonzalez become your

2  CME?

3     A     I believe it was the same time.  I don't

4  recall.

5     Q     And did anybody when you were the manager at

6  the Wheatland location prior to Melissa Gonzalez or

7  Roderick Wilson becoming your CMM and CME, did anybody

8  supervise you on a day-to-day basis?

9     A     There was communication between if Crystal

10  and the banking center or whoever if she was on

11  vacation, they would assign someone else to be.

12     Q     Did anybody -- was anybody physically present

13  to supervise you on a day-to-day basis?

14     A     No.

15     Q     And after Roderick Wilson and Melissa

16  Gonzalez between your CMM and CME, was there anybody

17  physically at the bank to supervise your banking

18  activities?

19     A     They came less than Crystal and Mike Rogers

20  came.

21     Q     So how often would Roderick Wilson show up to

22  your banking center?

23     A     Maybe every two weeks, if not three weeks.

24     Q     And he was your direct supervisor?

25     A     Yes.

Veritext Corporate Services

800-567-8658                                        973-410-4040

1  was following the policy that was placed for

2  situations like that.

3      Q    Now when you first started working at the

4  Wheatland location as the banking center manager, did

5  you lobby lead at all when you were recovering from

6  your foot surgery?

7      A    Yes.

8      Q    And when you did so, you would sit down?

9      A    I would both.

10     Q    You would stand and sit?

11     A    Whichever.  If my foot was swelling or

12  hurting, I would sit down.  If my knee was hurting or

13  my back was hurting because I was sitting down too

14  much, I would stand up.  There were several reasons

15  why my lobby leading would be affected, not just my

16  foot surgery.

17     Q    And were there other times where you would

18  assign other people to lobby lead so you wouldn't have

19  to?

20              MS. ALLEN:  Objection.  Question is

21  vague.

22     A    We were told by the market that a lobby

23  leader is necessary at all times and if you were not

24  able to, for whatever reason, to find or place

25  somebody there.

Page 95

1      Q     (By Mr. Patterson)   And were there times when
2    you were unable to and would place somebody else
3    there?
4      A    Yes.
5      Q     Okay.  And were there times when you were
6    unable to lobby lead because of the problem you were
7    having with your feet and you would place somebody
8    else in there?
9      A    Yes.  Not just my feet, you know, whatever.
10     Q     So were there times when you had other
11   problems, physical problems?
12     A    Yes.
13     Q     And would you assign other people to lobby
14   lead when you had those physical problems?
15     A    They were all compounding injuries, so one
16   affected the other, so it would be if I physically
17   felt able that I could or could not, I would be
18   there.  And if I couldn't or I was asked or I was
19   needed behind the teller line for any other reason,
20   those are also other situations where I would find
21   somebody to lobby lead.
22     Q     But there were times when you felt physically
23   unable to be able to lobby lead and you would assign
24   somebody else to lobby lead as a result?
25     A    Or I would sit down.

Page 96

1      Q    Or you would sit down.  Was there anybody at
2    the Wheatland Banking Center when you were the banking
3    center manager there who was physically present who
4    had the authority to tell you when you would could sit
5    and when you could stand?
6      A    No.
7      Q    Now in 2011 you received two written warnings
8    for performance.  I believe your first written warning
9    was June 13th, 2011.
10            Prior to June 13th, 2011, do you recall
11   receiving any kind of verbal warnings?
12     A    Not that was specified that it was a verbal
13   warning.
14     Q    And in those two written warnings that you
15   received in 2011, did either one of them discipline
16   you for sitting while you were lobby leading?
17     A    Yes.  They would say that customers and
18   associates were complaining because I was sitting down
19   in the lobby.  It may not have been in the written --
20   formal written warning, but it was expressed to me
21   verbally.
22            MR. PATTERSON:  I'm going to introduce
23   Exhibit 3.
24            (Ramirez Exhibit No. 3 marked.)
25     Q    (By Mr. Patterson)  Is this the written

Page 145

1    Q    Okay.  And did you have mock audits, mock

2    reviews?

3    A    That was something that the market did, yes.

4    Q    Did you have a mock review in May of 2011?

5    A    I believe so.

6    Q    And what was the purpose of the mock

7    reviews?

8            MS. ALLEN:  Objection.  Calls for

9    speculation.

10   A    To prepare for the actual audit.

11   Q    (By Mr. Patterson)  And would you get -- if

12   the mock review revealed a violation of a policy or a

13   procedure, would you get disciplined for that?

14   A    No.  Be coaching.

15   Q    Because the purpose or the mock reviews were

16   conducted to prepare you for the actual audit or

17   review; is that accurate?

18   A    Yes.

19            (Ramirez Exhibit No. 8 marked.)

20   Q    (By Mr. Patterson)  I'm going to hand you

21   what I've marked as Exhibit 8.

22            MS. ALLEN:  You did get my request for

23   privilege law, didn't you?  I see some are

24   redactions.  Are you going to get that to me?

25            MR. PATTERSON:  Yes.  This is just an

Page 148

1    policies?

2        A    From what I recall, whoever sold the money

3    needed to initial and whoever bought it from them

4    needed to have initialed.

5        Q    And the audits of your bank, they were

6    conducted to ensure that the banking center you

7    managed was following the procedures of the bank?

8        A    Yes.

9        Q    And why was it important to ensure that your

10   bank was following the procedures?

11       A    There would be occasional human error and it

12   needed to be identified.

13       Q    Why did it need to be identified?

14       A    To prevent loss.

15       Q    So if the policies and procedures weren't

16   being followed, it represented a liability to the

17   bank; is that accurate?

18            MS. ALLEN:  Objection.  Question

19   misstates prior testimony and the question is vague.

20   Go ahead.

21       A    If that type of error was typically human

22   error and not that the policy was not in place at

23   Wheatland.

24       Q    (By Mr. Patterson)  I understand that.  But

25   it was important for the people who worked in your

Veritext Corporate Services

Page 149

1   bank to follow the policies and procedures of the bank
2   to prevent the bank from experiencing losses, right?
3       A    I would agree.
4       Q    And as the manager of the bank you were
5   responsible for ensuring that the individuals that you
6   managed followed the policies and procedures of the
7   bank, weren't you?
8       A    I would agree.
9       Q    And would you agree that this is, you know,
10  one of the major responsibilities that you had as a
11  manager?
12      A    One of them, I would agree.
13      Q    Okay.  And do you know how the audits were
14  scored?
15      A    I don't recall.
16      Q    If a policy or procedure wasn't followed,
17  would it result in what was called a finding?
18      A    Yes.
19      Q    Okay.  So what is a finding?
20      A    When they find something that was not done
21  properly or expectation.
22      Q    And this could refer to any policy or
23  procedure, correct?
24      A    They usually focused on certain ones.
25      Q    Okay.  And so would a repeat finding be --

Page 235

1      Q      Okay.  And were you able to sit down every

2  once in a while?

3      A      He would complain about it and tell me he got

4  phone calls from customers and that the tellers were

5  complaining about me sitting down all the time.

6      Q      Okay.  Were you unable to sit down or were

7  you able to sit down?  Were you prevented from

8  sitting?

9      A      I would sit down as needed.

10     Q      Okay.  But you are stating that you received

11  some type of discipline because you sat?

12     A      He would make comments to me about me sitting

13  down, about tellers complaining about me sitting down,

14  about customers calling him directly to complain that

15  I was sitting down.

16     Q      Did you ever tell the customers why you were

17  sitting done?

18     A      The ones that would ask.

19     Q      Okay.

20     A      Or they would see my cast or my foot brace or

21  my knee brace or a cane or my crutches.

22     Q      So did you ever make an accommodation or a

23  request from anybody else other than the people we

24  already discussed?

25     A      Besides Aetna?

Page 240

1    Q    Okay.  Did any of your requests for FMLA

2   leave, were any of them ever denied?

3              MS. ALLEN:  Intermittent when she asked

4   for days off?  Objection, question is unclear and

5   vague.

6    Q    (By Mr. Patterson)  Did you ever apply for

7   FMLA leave and have that application for leave

8   denied?

9    A    No.

10             (Ramirez Exhibit No. 17 marked.)

11   Q    (By Mr. Patterson)  I show you what has been

12   marked Exhibit 17.  It is Advice & Counsel notes.

13   There is a create date on the first page.  What is

14   that create date?

15             MS. ALLEN:  Do you have one for me?

16             MR. PATTERSON:  Did I not give you one?

17   A    The create date says June 15, 2011.

18   Q    (By Mr. Patterson)  Okay.  And on the second

19   page it shows you called Advice & Counsel and said

20   that you had some back and knee issues and had been

21   treated by a doctor.

22             And then the last paragraph says you

23   were coached to obtain a doctor's note with any

24   restrictions and length of the restrictions.

25             Do you remember this call?  Do you

Page 266

```
 1      Q     In August of 2011 did you have a discussion
 2   with Roderick Wilson about a $2200 loss or a loss of
 3   approximately in the amount of $2200?
 4      A     I had a discussion.  I don't recall the
 5   date.
 6      Q     Okay.  And did you approve that transaction?
 7      A     It was being investigated at the time still.
 8      Q     Did you approve that transaction?
 9      A     I believe my MBK was the one that ended up
10   being the approving supervisor.
11      Q     Okay.  And when you initially talked to
12   Roderick Wilson about this $2200 loss, did you
13   communicate to him that the loss had come back to a
14   teller?
15      A     I communicated with him that the banking
16   center was just advising it was being investigated.
17   Thomas and Brittany were the ones that showed me the
18   first documentation.
19      Q     So you never called Rod regarding the $2200
20   loss and communicated to him that it came back to a
21   teller at your bank?
22              MS. ALLEN:  Objection.  Question is
23   compound.
24      A     I remember having a discussion with Rod at
25   the banking center.  He happened to be in on the same
```

Job No. 14842
Esparza v. Bank of America

Roderick Wilson Vol 2
October 25, 2012

Page 134

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION

3
      DAVETTE ESPARZA,              §
4                                   §
           Plaintiff                §
5                                   §
      v.                            §   CIVIL ACTION NO.
6                                   §   3:12-cv-00662-D
      BANK OF AMERICA, N.A.         §
7     and RODERICK WILSON,          §
                                    §
8          Defendants               §

9     /-------------------------------------------

10                 ORAL DEPOSITION OF
                 RODERICK EARL WILSON
11                  Volume 2 of 2
                  October 25, 2012
12    -------------------------------------------

13         ORAL DEPOSITION OF RODERICK EARL WILSON,

14    produced as a witness at the instance of the

15    Plaintiff, and duly sworn, was taken in the

16    above-styled and -numbered cause on October 25, 2012,

17    from 8:51 AM to 2:47 PM, before Gaylord A. Sturgess,

18    CSR No. 744, in and for the State of Texas, reported

19    by Stenographic method, at the offices of ACKERMAN

20    SENTERFLITT, 2001 Ross Avenue, Suite 2550, Dallas,

21    Texas  75201, pursuant to the Federal Rules of Civil

22    Procedure and the provisions stated on the record.

23

24                                    EXHIBIT
                                        B
25    Job No. 14842.as

Merit Court Reporters LLC
Phone: 817-336-3042          depos@merittexas.com          Fax: 817-335-1203

Appx. 015

Page 141

1      A.   At her banking center.

2      Q.   Who was with you?

3      A.   Nobody.  Just me.

4      Q.   Where did you meet?

5      A.   In her office.

6      Q.   And what did you say to her?

7      A.   That's been about a year ago.  So, off the

8  top of my head, what I said to Davette was based on

9  performance, based on the loss and the investigation

10  of the account that was opened under another

11  associate's sign-on, we're going to have to terminate

12  your employment with Bank of America.

13      Q.   Did you say anything else?

14      A.   I think she made a comment that I couldn't

15  terminate her.  And I said, based on the terms I just

16  gave you, I can.

17      Q.   Did you say anything else?

18      A.   To my knowledge that's all that was said.

19      Q.   How long did the meeting last?

20      A.   Probably five minutes tops.  And then I

21  helped her carry her items out to her car.

22      Q.   So the meeting you had with Davette lasted

23  five minutes tops.  During that meeting you said,

24  based on your performance and based on the fact that

25  you signed off an account under somebody else's ID,

Page 142

1    we're going to terminate your employment?

2               MR. PATTERSON:   Objection, form.

3        A.   What I said was, is that based on your

4    performance, based on the account that was opened on

5    another associate's sign-on, and based on the loss

6    that she had taken, or that she had signed off on, was

7    going to terminate her employment with Bank of

8    America.

9        Q.   Did you say anything else?

10       A.   Well, she made the comment -- and I just

11   stated that a minute ago.  But she made the comment

12   that, you can't terminate me.

13               And I said, based on the terms and

14   conditions I just gave you, yes, I can.  And then I

15   helped her carry her items out to her car.

16       Q.   Now, after you said, yes, I can, you started

17   what, gathering up her items?

18       A.   Well, I gave her the opportunity to start

19   packing up her items.  I helped her carry them out to

20   her car.  She had a -- I think she had some boxes,

21   some pictures, a refrigerator; items that were in her

22   office.

23       Q.   How did you give her the opportunity to pack

24   up her office?

25       A.   I let her pack it up.

Job No. 14842
Esparza v. Bank of America

Roderick Wilson Vol 2
October 25, 2012

Page 396

1    get it in on time or ask for an extension?

2        A.  Okay.  So based on my knowledge, whenever I

3    made a request of my managers, they got those

4    deliverables in on time.

5            Davette was really the only one who,

6    every kind of made a -- maybe not every time.  But

7    quite often, when I made a request of her, she'd turn

8    items in late.  It was a trend.

9        Q.  Did you ever inquire whether or not Davette

10   Esparza's Intermittent Family Medical Leave Act could

11   be -- absences to be contributing to the failure to

12   get the, quote, deliverables, as you called them, in

13   on time?

14            MR. PATTERSON:  Object to form.

15       A.  I never questioned her leave or her impact

16   in her work.  The only thing I coached and held her

17   accountable for was when she was in the banking

18   center.

19            If she had had any issues with wanting

20   extensions or needing more time, she should have

21   brought that information to my attention.  And she --

22   and to my knowledge, she did not once bring to my

23   attention:  I am having to miss work for X.  Can I get

24   an additional day or two days based on this?

25       Q.  Now, you do recall that Davette tried to

Page 397

1    talk to you about needing some FMLA leave of absence

2    time in September for some surgical or medical

3    procedure, don't you?

4        A.   I want to say she had sent me some type of

5    email stating she was getting ready to have knee

6    surgery or back surgery, but I don't remember

7    specifics on it.

8             But I'm not the one who approves or

9    declines FMLA leave.  That all goes through our Aetna

10   department.  I have no say-so in approving leave.

11       Q.   But you understand that Davette had gone

12   through Aetna and had been approved for intermittent

13   FMLA leave, correct?

14       A.   I do understand she was approved for that.

15   But again, I have no say-so in approving or declining

16   a leave.  But I know she had been approved for

17   intermittent leave.

18       Q.   So what is your role with respect to

19   approving when Davette needed to take intermittent

20   FMLA leave?

21       A.   I don't have a role.  If she needed to

22   take -- the way I understand intermittent leave is

23   that it allows her to go to any doctor's appointments

24   or follow-up appointments as necessary.

25             She just lets me know, shoots me an

Job No. 14842
Esparza v. Bank of America

Roderick Wilson Vol 2
October 25, 2012

Page 398

1    email saying, I need to be off.  And that's it.  I

2    don't approve or decline her taking the time off

3    because it's already been approved by Aetna.

4        Q.   Did Davette ever shoot you an email and let

5    you know she'd be taking intermittent leave for any

6    reason?

7        A.   Sometimes yes, sometimes no.

8        Q.   What do you mean, sometimes no?

9        A.   Sometimes she shot me an email, and

10   sometimes she didn't.  Like the example I gave you, I

11   would stop by the center sometimes and she was gone.

12       Q.   And you later learned that she was gone for

13   some doctor's visit or the other?

14       A.   It was for a variety of things.  Sometimes

15   it was doctor's appointments.  Sometimes it was a

16   function at her kids' schools.  There was a variety of

17   times that I showed up sometimes and she wasn't there.

18              But I just want to be clear.  I did not

19   approve or decline any type of leave with the bank.

20       Q.   Okay.  So it's your testimony that Davette

21   would shoot you an email saying, I need to be gone for

22   these three days, or this day, or these two hours; and

23   you would just take that as information and not

24   respond?

25       A.   End of conversation.  I didn't approve or

Job No. 14842
Esparza v. Bank of America

Roderick Wilson Vol 2
October 25, 2012

Page 399

1    decline any of her leave.

2         Q.    So you didn't -- when she let you know she

3    had to be gone for intermittent leave, you didn't give

4    her any feedback or response?

5         A.    There isn't any feedback to give her.  I

6    can't tell her she can't go.  I can't tell her when to

7    go.  I can't tell her to switch appointments.

8              She tells me she needs the time off

9    based on intermittent leave, and she's allowed to take

10   it.

11        Q.    But you were aware, weren't you, that

12   Davette had arranged to take intermittent leave with

13   HR -- or with Advice and Consent {sic}, because you

14   wouldn't deal with her on that subject, in late

15   September?

16             MR. PATTERSON:  Object to form.

17        A.    So, time out.  You maybe need to restate the

18   question.  I didn't understand it.

19        Q.    Well, Davette testifies that she tried to

20   talk to you about the need to take intermittent FMA

21   {sic} leave in September, late September, that she was

22   already approved to take that leave before you fired

23   her, a couple of weeks before she was to leave or a

24   couple of days before she was to leave.

25             Is any of that in your recollection?

Appx. 021

Job No. 14842
Esparza v. Bank of America

Roderick Wilson Vol 2
October 25, 2012

Page 400

1          MR. PATTERSON:  Object to form.

2      A.   The only thing I remember is that Davette

3  shot me an email that said she was going to need to

4  have some surgery.  At that time I was not aware if

5  her leave had been approved or declined.  I have no

6  say-so in that.

7          Once it's approved, I get an email or

8  some type of communication from them stating, employee

9  leave, will be back on X day.

10          But at that time all I had gotten was

11  an email from Davette, I want to say stating that she

12  needed either back surgery or knee surgery, and that

13  she was going to need to take some time off in

14  September.  I was unaware if her leave had been

15  approved and/or declined.

16      Q.   And it's your testimony you didn't respond

17  one way or the other to Davette with regard to that

18  leave in September?

19      A.   To my knowledge, I don't remember responding

20  to her because, I mean, I have no way to -- I don't

21  approve the leave or decline it, so there wasn't

22  really anything for me to say.

23      Q.   So as her manager, it's your testimony that

24  you had absolutely no role in Davette being allowed to

25  take intermittent FMLA leave?

Page 401

1      A.   I have no role.   Nobody but Aetna determines
if she gets approved or declined for leave; not me,
not Melissa Gonzalez, not any bank associates.   It's
all handled through Aetna.

       Q.   And if Davette testifies that Advice and
6   Consent informed her she was to talk to her manager
7   about the need to be absent for intermittent FMLA
8   leave, would you believe she's lying or mistaken about
9   that?

10            MR. PATTERSON:   Object to form.

       A.   No, she would be right.   She's supposed to
email me.   She just didn't do it every time.

            But the email is just to let me know.
It not to approve or decline.   I cannot approve or
15   decline any leave.   Intermittent, maternity, any type
16   of leave I cannot approve or decline.   Per FML -- not
17   FMLA, but per intermittent leave, she's supposed to
18   shoot me an email and let me know.   She just didn't do
19   that every time.

20      Q.   And how did you feel when you figured out
21   she was gone on intermittent leave and you didn't get
22   an email?

23      A.   Really I didn't feel one way or the other.
24   My only concern was not knowing that a manager wasn't
25   at the bank for the associates, for the customers.

Job No. 15028
Esparza v. Bank of America

Florence Coble
November 14, 2012

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION

 3    DAVETTE ESPARZA,

 4          Plaintiff,

 5          vs.                    NO. 3:12-cv-00662-D

 6    BANK OF AMERICA, N.A.
      and RODERICK WILSON,
 7
            Defendants.
 8

 9    _____

10                ORAL DEPOSITION OF
                FLORENCE 'DEE' COBLE
11               November 14, 2012

      _____
12                ORAL DEPOSITION OF FLORENCE 'DEE'

13    COBLE produced as a witness at the instance

14    of the PLAINTIFF, and duly sworn, was taken

15    in the above-styled and numbered cause on

16    November 14, 2012, from 10:21 a.m. to 1:11

17    p.m., before Lisa A. Wheeler, RPR, CRR, in

18    and for the State of North Carolina, reported

19    by stenographic method, at the offices of

20    McGuire Woods, LLP, 201 North Tryon Street,

21    Suite 3000, Charlotte, North Carolina,

22    pursuant to the Federal Rules of Civil

23    Procedure, Notice and any provisions stated

24    on the record.

25    Job No. 15028
```

EXHIBIT
C

Job No. 15028
Esparza v. Bank of America

Florence Coble
November 14, 2012

Page 83

1        A.    On 7/13, yes, I did speak to her.

2        Q.    And the substance of the

3    conversation you wrote down in the notes,

4    correct?

5        A.    Yes.

6        Q.    Then it looks like you tried to call

7    her earlier on the 13th as well and you made

8    a note of that?

9        A.    I called -- well, that's prior to

10    the -- the call where I actually got her but,

11    yes.

12        Q.    Okay.  And then this is reverse

13    chronological order so then on the 8th of

14    July you also called the employee and you

15    left a message advising her that her concerns

16    have been addressed and left a direct number

17    and message.  Did you make that note?

18        A.    I did.

19        Q.    What did you leave -- what message

20    did you leave?

21        A.    That her concerns had been addressed

22    and my direct callback number.

23        Q.    Do you remember what those -- what

24    you said at this point, what concerns you

25    were talking about?

Page 86

1          A.    Okay.   I see it.

2          Q.    Now would you read that little four

3     lines there.

4          A.    CMM states was initially calling in

5     to advice and counsel to -- to discuss

6     placing associate on disciplinary action.

7     CMM states will still need to address the

8     issues associate is having in performance.

9     Advise CMM understands.   Advise CMM will

10    reach out to associate and advise concerns

11    have been addressed.   CMM states will call

12    advice and counsel back to discuss

13    associate's performance issues.

14         Q.    And so then you went on to discuss

15    the concern that the employee brought to you.

16    Is that what these notes mean?

17         A.    Correct.

18         Q.    Do you recall anything specifically

19    about whether or not the employee's concerns

20    that other stores had scored a six had not

21    been treated the same as she?

22         A.    Only what I would have put in here.

23         Q.    But in reading these notes it is

24    clear, isn't it, to you that the employee was

25    concerned that she was being treated in a way

Page 94

1       performance manager but, again, I -- I don't

        Q.    Okay.   EE states on the following
leader call after the audit they discussed
best practices.   EE states the CME makes the
6   PowerPoint presentation, was made and
7   forwarded to her team.   EE states the first
8   page said, this is what failure looks like.
9   EE states was devastated.   Now here's the
10  part -- I want to know what you meant by
this.   EE states there were audits after her
that made a six but didn't see the same type
of treatment with them.

        How did you interpret what the
employee was complaining about there?
        A.    The -- this is what failure looks
like.
        Q.    The fact that -- that there was a
19  PowerPoint presentation that said, this is
20  what failure looks like?
21      A.    Based on her stating that she was
22  devastated, yes.
23      Q.    And also did you understand her to
24  say that other employees' banking centers had
25  made a six and they didn't get treated the

Job No. 15028
Esparza v. Bank of America

Florence Coble
November 14, 2012

Page 95

1    same way that she did?

2         A.    From -- from what I have here, yes.

3         Q.    So you understand that to be a

4    complaint about disparate treatment, don't

5    you?

6         A.    I understand that to be the

7    associate's concern, that there weren't other

8    PowerPoint presentations the same.

9         Q.    You understood that the employee was

10   complaining about being treated disparately,

11   correct?  I have the same score as somebody

12   else.  They didn't have this PowerPoint

13   presentation that said, this is what failure

14   looked like, I did.  You understood that,

15   correct?

16        A.    That she was upset, yes.

17        Q.    And about disparate treatment?

18        A.    About the PowerPoint presentation

19   stating, this is what failure looks like,

20   yes.

21        Q.    And you understood she was concerned

22   because other people weren't treated the

23   same -- as harshly as she was.  You

24   understood that, didn't you?

25        A.    From --

Page 106

1       Exhibit 1, correct?

2            A.    Correct.

3            Q.    And then on the 8th there's another

4       note.  Did you make that note?

5            A.    I did not.

6            Q.    Can you tell me why that note was

7       made a part of this case number?

8            A.    I cannot.

9            Q.    Okay.  But in any event, we do know

10      that Mr. -- from these notes anyway that

11      Mr. Wilson called in to discuss the

12      employee's performance, discussed COD Coble

13      had reached out to market.  CMM states he has

14      had several EEs call him in recent days.

15      Discussed CO would call him -- would call CMM

16      before today.

17           And that's what your associate wrote

18      on the 8th.  That's your understanding of

19      reading that, correct?

20           A.    What my teammate wrote, yes.

21           Q.    What is the next thing that happened

22      regarding Davette Esparza and her issue she

23      called you about?

24           A.    I called the CMM.

25           Q.    And what date and time did you call?

1       A.      On 7/8, the same day.

2       Q.      Okay.   And in terms of the

3    conversation that you had with the CMM Rod

4    Wilson and with the CME Melissa on the line,

5    the conversation was documented by you in

6    your notes that follow the create date 7/8,

7    correct?

8       A.      Correct.

9       Q.      And other than these notes do you

10   have any independent recollection of

discussions with Roderick Wilson or Melissa

Gonzalez about Davette Esparza?

        A.      I do not.

        Q.      Okay.   And then you left the message

15   for the employee it looks like that the

16   concerns had been addressed.   Is that

17   accurate?

18      A.      It is.

19      Q.      Now it looks like you called again

20   on the 13th.  Can you tell me why?

21      A.      Because I had not heard back from

22   the associate.

23      Q.      Okay.  And so on the 13th the

24   associate did call you back?

25      A.      Correct.